Mr. Biscalco, is that correct? That is correct, Your Honor. Good morning, Your Honors. As the Court has stated, my name is Horace Biscalco. I am here on behalf of the petitioner, Joan Muirhead. I would like to allot three minutes with regards to rebuttal time, if necessary. Okay. Your Honor, this case centers around specifically, in my opinion, one central issue regarding expedited removal procedures. This case, like many other cases that I represent individuals on, has always sort of started the same way. Somebody gets woken up in the morning by officers, gets taken off, and has a piece of paper put in front of them that addresses certain rights that they have regarding being removed from the United States expeditiously. There is no Miranda language, although we do review the paperwork, there is language in there that addresses that you have a right to be represented, and so on and so forth. But the question I always have to ask is, when these individuals are taken out of their home and they're in this holding cell, they don't have this right to a telephone call, to call for an attorney representative. I'm not going to dickens every time I'm trying to get my head around this case. Given the waiver that she signed, given the problems with jurisdiction, maybe you can help me get to the issue you're trying to get to. She has no right to counsel. It's a matter of law. It's not a criminal proceeding. She doesn't have a right to counsel. So Miranda doesn't even apply. She wants to, and I guess a due process claim that purportedly gives us jurisdiction, is that she was denied due process. But let's assume that you can cross all those hurdles. You have to show prejudice. In your, I think it's a footnote in your brief, you mentioned that she has extensive, not extensive, she has a number of violations of probation and parole, and you're saying that you didn't get the information about the specific aggravated felonies until after she was arrested in Fuger, approach to this case, the waiver was thrust in her face and she signed it. But there's nothing here to suggest that she's not an aggravated felon. In fact, you don't, the fact that she has a number of probation violations and parole violations, you don't get those unless you've got a criminal conviction to begin with. So that doesn't mean that she's not an aggravated felon. I don't see her contesting the fact of her prior aggravated felonies or the two cases that the government maintains were convictions that that's her and that she was convicted. So even if you can show all these things about notice and opportunity, the due process procedural you're entitled to, where does that get you? Because how can you show prejudice? Your Honor, the prejudice is shown because if Ms. Muirhead would have been detained back in 1988 at the time of the first alleged conviction in the state of New Jersey, or if she would have been detained in 1994 at the time of her probation violation, Ms. Muirhead would have been eligible for suspicion of deportation under the Immigration and Nationality Act. Well, help us with that. Section 1182C before 1996 applies only to, quote, aliens lawfully admitted for permanent residence, and your client was not lawfully admitted for permanent residence. And she's conceded that, that she's not a lawful permanent resident. And then with respect to Section 1254 pre-1996, we have our case in Hernandez v. Gonzalez. Doesn't that shoot down that theory? Your Honor, my answer to that question would be that by simply saying that somebody who was in this country unlawfully and for somebody who was in this country admitted for permanent residency, you're bringing up an equal protection argument at this juncture. How can you at this juncture state with regards to even the developments under 245I of the Immigration and Nationality Act where they allowed individuals who were lawfully in the United States to, quote, unquote, have an ad in the state? If you're going to be able to differentiate with regards to some situations, well, I would argue that in this context, if she was admitted for lawful permanent residency or if she was not admitted for lawful permanent residency, the argument that we have to take a look at is that what rights would she have had to argue before a court at that juncture? And at that time, she would have been able, under Section 244 of the INA, to be able to argue that she qualified to at least have her case reviewed for suspension of deportation. And if she had the ability to have her case reviewed for such, she would have been given that opportunity to further her due process rights in this context. My concern is that she never even got to step one, which was she never even got to the aspect of being able to present any of these arguments to anyone because by the time we were able to do anything with this case, she was already deported from the United States. Had she not signed the waiver, what would have happened procedurally? Procedurally, what would have happened or what should have happened, Your Honor, as I would advise, she would have then been able to ask for an attorney to come view the situation. We would have been able to review the evidence presented against her, which would have been these two convictions. And the one thing that I do stress in my brief is that when you review the documentation provided with regards to these convictions, the one conviction in 1994 stresses the name of Jennifer Wright in the I-8, in the I-5, in the 8-5-1, stresses the name Jennifer Wright. There is no link between Jennifer Wright and my client. Except your client has said it's her. My client never said it was her. Well, she signed the waiver form in which she admitted that she was the person named in the INS papers and that she was a convicted felon, an aggravated felon. And that is correct, Your Honor. But I would stress, though, Your Honor, that when she gets to that point, that the Fifth Amendment, that our Constitution affords her at least some right to be able to have some warning prior to her being able to sign these papers. I mean, when we look at this, it's not black and white. It's gray, complete gray. We're taking a situation and we have to look at it almost on an ad hoc basis. These individuals are arrested, they're brought in, and they're not given this opportunity to think clearly. They have somebody over them who, in some regards, and I'm not saying it happened in this context, but I'm arguing with regards to the state of the law here, that these individuals are either said, if you don't sign this, something's going to happen to you. Or this, I mean, they are, in some regards, I would argue, coerced because they do not have the protection at that juncture. And then all of a sudden, they get to the point that the family... The protection of what, though? The protection of counsel. The protection of understanding what their due process was. They're not entitled, you know, as a matter of, just a visceral matter, your argument makes perfect sense to me. But they're not entitled to counsel at that point. I mean, what you're saying is right, but the law does not recognize their right to counsel at that point in the proceedings for them. What I would ask for this honorable court to do is to create some form of a warning, something in the steps towards expeditious administrative removal, something that has to be done to, if not a right to counsel, then at least a right to a phone call or a right to be able to do something that puts persons on alert that, in fact, they have this happening to them. We have a situation here that if she was not drug out of her house in the morning when her family was home, quite frankly, they would have come home and she would have been there and ICE was not going to be leaving a calling card at the door saying, please call us, we have somebody in custody. Nobody would have known. Is it a problem that you don't have a record to show any kind of coercion in here? Your Honor, I'm never going to be able to have a record in this case of that because my client can't testify, because my client was never given the ability to go before an immigration judge or for that matter to speak her mind before any of the district courts as to what happened. The only thing I have is the information provided to me from my interview with her. Thereafter, I have nothing more to show. And, I mean, I'm not sure what ICE would say or the deportation officer in this case, but I could probably say that there was no coercion in this case for her to sign that. But my remark is if you're going to pull someone out of bed and push them into a whirlwind that she wasn't even aware of, I mean, this individual was here since 1980. I mean, she had no expectation that she was going to be thrust into the immigration system, let alone not have the opportunity to be able to present a case and defend herself. And the argument I'm making is that, you know, Your Honor's fine if you're going to say that she's an aggravated felon and therefore possibly jurisdiction may not lie with this court because there might not be a due process violation. I would stress that that would be a misconception, but at least create some form of basis so that when an expedited administrative removal order is handed down or presented, that there's either a warning presented to the individual as to what's going on. There might even be a waiting period. I mean, a cool-off period so that this individual could read this and then make a phone call to an attorney or do whatever. Yes, there is no right to counsel, but that doesn't mean that there cannot be a due process right to allow this individual to be able to review what's going on and comprehend it. I mean, my concern here is that, yes, in 1988 she was convicted of an aggravated felony. There is no dispute of that. The problem here, though, is that she had no right to build a record. She had no right for review. She had no right to be able to consult with an attorney. And under the administrative removal procedures, I mean, there is a degree of due process, if you'd like to call that, which in and of itself allows an individual to call an attorney to be able to have the opportunity. Well, what are you reading from there? Well, I'm reading from my brief, Your Honor, on page 12. Can you tell us something a little more authoritative? I will, Your Honor. When looking at the scheme, I would be looking at this pursuant to 8 U.S.C. section 1228 subsection B. That is a subsection dealing with the scheme for administrative removal. Also, the information itself was in an unpublished case, Alfred v. Gonzalez, which is a 2006 case. The site for that is 2006 WL1308644. It is an unpublished case, and it is a slip opinion. But in that case, the court did stress that there is also the ability for the individual to review with regards to what evidence has been used to put together those charges. In the present case before you, Your Honors, my client did not have the ability to do any of that. It was only until she was able to get her family to contact an attorney, at which point I was the attorney she contacted, I was able to go over to deportation and I was able to talk with one of the officers to be able to find out what's going on. Of course, I was told, I'm sorry, we can't disclose that for national security purposes. Wait a minute. Are you being facetious now? I'm not being facetious. That is the response I got at the window, and finally, after waiting about an hour, she had asked to be able to see me, and one of the officers came out and said, will you come back to the room? By that time, she had signed her paperwork and everything was done, and when I had asked for documentation, they said, you have no right to documentation because she's waived her rights at this point. And how long was that after she was taken to the custody? I think, no, it was the same day, probably around noon, that I was able to actually come and talk to her. But that was my initial response. I was not able to see her for national security purposes. And my question was, what national security purpose is here? Trying to see if this individual is doing the right thing, making the right decisions. If I don't have the ability to do that, if any attorney does not have the ability to do that, then what we're doing is we're giving, Congress is giving, sheer autonomy to immigration officers to simply pick up people, bring them in, and throw them out of the country without much more than that. And I see my red light's up, so unless there's any questions, Your Honors, I thank you for your time. You saved somebody a problem. I did, Your Honor. May it please the Court, Tom Dupree on behalf of the United States. I'd like to begin with the exhaustion issue. This Court has jurisdiction to review final orders of removal only in cases where the alien has exhausted his or her administrative remedies. The exhaustion requirement is explicitly set forth in Section 1252D1 of Title 8. In this case, it's clear that the petitioner failed to exhaust her administrative remedies. The petitioner had a right, both under the expedited removal statute, as well as the corresponding regulations, to, among other things, contest or rebut the charges listed in the I-851 to present evidence. How did she do that? In this context, how did she do that? Assuming a waiver or absent a waiver, Your Honor. In this context, assuming the waiver that she gets the same day that she signs. Well, she's executed a waiver. Of course, she's waived her right to avail herself of those procedural protections. I would also point out, though, that if you have... You're here for the gentleman by the name of Francis Kay? Francis Kay. Right. I think it might be Joseph Kay. I think it's Francis Kay. The book starts out something like, something must have happened to Francis Kay because he was arrested one fine morning. It's Kafka. Oh, Kafka. The trial. Right. Yeah, absolutely. I think it's Joseph Kay. Maybe Joseph. I'm confused. Maybe Joseph Kay. I am, but, Your Honor, respectfully submit that this situation is far from Kafkaesque for a number of reasons. First, the combination of Heller and Kafka, because there's catch-22 there also. Exhaust the Administrative Remedies. How does she exhaust the Administrative Remedies? Well, she does ABC. But wait, she's waived ABC. Yeah, so she can exhaust the Administrative Remedies. But how does she make that argument? Well, she makes that argument by filing a petition. How does she file a petition? Well, she can't file a petition because she's waived it. How does she contest the waiver? Well, she can't contest the waiver because she's waived the right to contest the waiver. That's almost like a combination of Heller and Kafka got together, and the result is Joan Muir had this threat to national security before us today. Well, again, I'm not quite sure where the national security issue came from. I certainly haven't seen anything to that extent in the record. I know counsel made a statement while up at the podium, but, again, I think the record is silent on that. With regard to Your Honor's point about this being Kafkaesque, I would note two things. The first is that this waiver that she executed has been upheld as perfectly legitimate by other courts. The plaintiffs' or petitioners' counsel said it was— Has Muir been in another court? Has she been in another court? Well, she's been in the New Jersey courts, yes. And she argued the waiver in the New Jersey court? Oh, I beg your pardon. I misunderstood Your Honor's question. Has she presented the waiver argument in other courts? Well, you said it's been upheld by other courts. I'm not sure they've had the same factual context. Well, the Benitez decision from the Fifth Circuit concerned the validity of the waiver and whether it was coerced and whether the process was— We're talking about the waiver, somebody else's waiver. In another case, I think that's what you're talking about. That's exactly right, Judge Stapleton. That's what I'm talking about. Just the procedure as a whole. To raise her specific facts and whether or not the waiver is valid just seems troubling. You may be absolutely right here, Mr. Dupree, but don't you find this so troubling that a woman can be taken out of her home? She's got seven kids. I think all four of them are U.S. citizens. She leaves them behind. She's taken to wherever she was taken into custody, and that's always the local jail. It may have been an immigration detention facility, but it probably looked a lot like a jail from her perspective. She's given a form. I don't know what she's told, but she signs the form, and after she signs the form, it's all over. Shouldn't there be some— Mr. Blalock, Mr. Bispolko used the term quote-unquote for it, but shouldn't there be something built into the process to make this a meaningful waiver if she has the opportunity to get her own attorney? She has no right to her own attorney, but if she's given the opportunity to find a lawyer who will represent her, shouldn't that be something meaningful so that she's given a day or two or whenever and told come back here in three or four days? It just seems like there should be something built into the process, and I think this is what your friend is arguing, so that we don't have this situation where people just kind of get swept up, taken into a situation where my guess is 99% of people given this form sign it because it's a pretty suggestive atmosphere that they should sign it, and after that, it's gone, and the result is that we have a woman who is a 25-year resident of the United States. Four of her minor children are citizens of the United States. She is a certified nursing assistant. Apparently, it's represented that she volunteers within the community. I don't know how accurate that is and how helpful she is, and all of this because of her two prior convictions, which give you the right to do it, but shouldn't there be something built in to make it a little less Kafkaesque? Well, again, Judge McKay, I respectfully disagree that the system is Kafkaesque, and with regard to this particular case, I think one of the reasons why it is not at all troubling is that the petitioner's counsel has never introduced any sort of evidence of coercion or even alleged in his correspondence with DHS that there was a coercive atmosphere when she executed the waiver. As the court knows, and this is page A31 of the petitioner's appendix, this is the letter that the petitioner submitted to ICE, he doesn't even allege coercion, nor does he submit an affidavit, even assuming that he could have attempted it. This is after you've already closed the case. The case was terminated before a lawyer ever got an opportunity to send the letter. Well, what is the... I understood Judge McKay's question to be that just suppose somebody is coerced here and six days later there's a removal order entered and doesn't have a real opportunity to contest. Judge, what is the remedy? Where does somebody like that go to have this due process claim considered? Well, I think, Judge, in the first instance, you can very well go to the agency. When Your Honor says that they had already made up their mind, I think if the petitioner's counsel had furnished some sort of evidence or even made the assertion to the agency that, wait a minute, this woman was improperly coerced into signing it. And again, the statute does, Judge McKay, provide for certain time limits in terms of when she can actually be removed from the country. And I would also note that it's not necessarily the case that it would be mooted out simply because she was removed. To be sure, a challenge to her detention would be mooted. But I haven't heard the petitioner's counsel suggesting that he would have been prevented by mootness in any sense from alerting the agency to the problem. You're suggesting a motion to reopen was available? Yes, I think certainly either a motion to reopen or simply what counsel did was approximately eight days after she executed the waiver, he submitted this letter to the agency in which he made a number of arguments, didn't mention or suggest any hint of coercion, although the regulations gave him the right to furnish evidence, including affidavits. As we know, she allegedly was originally arrested in her home in front of her family, so there were obviously many witnesses about. There were certainly things that counsel could have done to alert the agency to this process, to let the agency evaluate it, determine whether or not a remedy was appropriate. If it declined to halt the removal process, to reopen the proceedings, very well. If it said, we lack jurisdiction, well, then the petitioner could take that claim up to this court. So I think, Judge McKee, this gets to your question about whether she would have been shut out. The answer is no. I think another reason to respond to Your Honor's question on why this is a Dukovka-esque situation is because, as Your Honor correctly noted at the outset, there's absolutely no prejudice here. We are still waiting for some sort of cognizable theory as to why she was not removable. There simply is none. As Judge Stapleton correctly noted, the two provisions that the petitioners invoked here both were repealed long ago. There is no liberty interest in obtaining what is clearly discretionary relief. That is not a protected interest of constitutional dimension, and thus it cannot serve as a predicate for an alleged due process violation. There's no prejudice in this case. So even if one were to assume that there was a procedural flaw or coercion in the waiver, there's absolutely no prejudice resulting from it because, as she acknowledged when she signed the waiver, she has no defenses to removal. She was an illegal alien. She doesn't dispute that. She was an aggravated felon. She doesn't dispute that. We're still waiting for some cognizable theory under an existing statutory provision as to why she wasn't removable, and we have none. There's no evidence of coercion. And so I would submit, Your Honor, that this is far from a Dukovka-esque sort of case. I think one other point just quickly to make before I close is that numerous courts, including the Fifth Circuit, including the Ninth Circuit, including this court, albeit in an unpublished opinion, have upheld this procedural and statutory framework, the expedited removal framework. They have all held unanimously that the procedures set forth in Section 1228 of Title VIII fully comport with all due process requirements. No court, at least to my knowledge, and Petitioner certainly cites none, has held to the contrary. I think, in addition, the very last point I'll make, unless there are further questions from the panel, is although the Petitioner has also alleged, as part of her 212-240 argument, that one reason she was not able to assert these claims is because ICE had allowed several years to elapse after her conviction, and presumably if ICE had initiated removal proceedings at an earlier stage, she would have been able to assert her rights under these statutes. That argument was directly rejected, Judge McKee, in the opinion that Your Honor authored in the DiPepe case, which is cited in the briefs where Your Honor correctly noted that an alien has no constitutional right to have removal effected within a set period of time. Unless there are further questions from the panel. Had you ever heard of the writ of Audita Correla before? Judge Stiglitz, I have to confess I hadn't, and I went through the Sixth Circuit's opinion that was cited. I found it somewhat of a tour de force. I was interested to note that the Sixth Circuit subsequently granted on-bank rehearing in that case and vacated the panel opinion. I wasn't able to learn anything more from that, but it certainly was interesting. Don't feel embarrassed. I've been on the federal bench for 37 years, and I had never heard of a writ of Audita Correla. But you learn something every day. I think it's fair to say it's not commonly invoked. Certainly I think this case is a particularly poor vehicle for invoking it. As I understand the Sixth Circuit's discussion of it, it's properly invoked only when the court characterizes as extraordinary and extreme circumstances. I certainly think that this case does not qualify as such, and I saw no basis in the now vacated Sixth Circuit panel opinion nor any of the district court opinions cited that would even remotely provide a whisper of the possibility of a read for the petitioner in this case. Mr. Dupree, you speak faster than I can think. I'm sorry, Judge Stiglitz. I saw my time ticking down, and I wanted to make sure I got my points in. You got them in, and I understood every one, too. It's amazing. Well, that's a rarity for me, at least. That guy that was a FedEx commercial through Peter in Pittsburgh who spoke very quickly. Did you understand everything he said? Well, as long as the comprehension is there, I suppose that's all we need. Terrific. Well, unless the court has further questions, I'll waive the balance of my time. Thank you. Thank you. What about his argument on coercion? You're alleging that circumstances allow for, in fact, that coercion is pregnant in the circumstances. Are you specifically saying, other than the dynamics themselves, that there is any coercion and that but for that coercion, she would not have executed the waiver? Your Honor, if I understand the question, it's hard for me to be able to present, Your Honor, with a specific instance of coercion in this case because there is no record to look back on but for it. Are you saying you had a chance to talk to her? You did a follow-up for David from her saying, did this to me, is it good cop, bad cop, or good INA, bad INA, whatever the equivalent of it is? Your Honor, what we did was we sent a letter to ICE explaining in that letter that we had requested a Joseph's hearing as well as we explained certain inaccuracies that we had with the I-851. That letter was ignored. It did not address. Nobody ever presented any evidence to me. Your Honor. It didn't say anything about coercion. Your Honor, it did not say anything about coercion but I posed the question to myself and to Your Honors as well. So I wouldn't put an affidavit together saying my client said it's coercion. My experience of that is that every single defendant in a criminal case argues coercion when the red flag is up and they need to bail out of the boat. And on top of that all, if they're not going to respond to a letter that I sent within the statutory framework to be able to respond to the I-851 saying that there were issues with regards to the evidence that they were relying upon with regards to the issuance of this, why would they respond because my client is saying that the officer spoke mean to her? I mean, they're not going to respond at all because that's just the tactic that they take. I might be overstepping by saying that, Your Honors, but frankly from the experiences that I have had with regards to the agency and with regards to the service, many things go upon deaf ears. And it is not until I had to file the writ for habeas corpus and injunctive relief to the Eastern District that I received any evidence whatsoever from anyone. It wasn't until it went to that level that I was given anything. So I give it to the agency. The agency does a review with them when I'm back in the Eastern District and by that time my client's gone, has signed her rights away, and I have the issue with regards to do I have a due process violation. Isn't that too late, Your Honors? Don't we need something ahead of time to be able to secure the well-being and safety of these individuals prior to me having to get before the Eastern District to then have the case transferred to your court? Well, what about the prejudice? If we forget for a second the 242 argument, I'm assuming that she is the person who was convicted in New Jersey of the two drug charges, whose name then may not have been recorded as June Muir, but I'm assuming it's the same person based upon the waiver that she signed. And I'm assuming that the two convictions that she got constantly do not contest with the other aggravated felonies. Isn't that the end of it? No, Your Honor. Except for I understand the argument written in the procedural process, but if you have to get to the prejudice, isn't that the end of the prejudice argument? Your Honor, the prejudice idea is case-related. When we look at prejudice, outside of what is seen, we have to take a look at what she has gained in the United States. Now, again, it's a double-edged sword. Why should we be rewarding somebody who's in the United States? It's important, Ken, that anybody who stays, in fact, the longer they stay, the better the due process team becomes. But I understand what you're saying. You're arguing almost laches, inequities. But that's not what the due process prejudice problem is about. Your Honor, I understand that, but I'm not arguing laches. In effect, what I'm saying is that there are a lot of people in the United States who continuously reside here illegally and commit crimes over and over and over again. There is never a break in that time. My client may have committed a crime in 1988, but in 2004 and 2005 and 2002 and so on and so forth, she rehabilitated herself. She had a family. She had United States citizen children in that family. She had become a certified nursing assistant. This is not the situation where we're looking at somebody who is here unlawfully and just kind of collecting goodwill. She hasn't done that. What she has done is she's done wrong. If she would have been asked to address those issues back then, she may have had a better opportunity to deal with that and maybe cut off or stop her from collecting any more goodwill. But from 1994 until she was arrested, in 2005, I believe, Your Honors, she had not been involved with any criminal activity. She had presented herself as a good citizen of the United States, somebody who, in fact, was doing what was right at that time. The prejudice is that, in fact, we shouldn't be rewarding her for having the time here, but what we should be rewarding is the fact that, unlike other individuals, she hasn't recommitted offenses. She's built a family and she's done positive things. Thank you, Richard. The public is, again, very well argued on both sides. Thank you very much for your time. Thank you, Your Honors. I'm taking that under advisement. Thank you. The final case is Lordi, I guess that is, out the door versus Attorney General.